Slip Op. 13-49

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHANG CHUN PETROCHEMICAL CO. LTD., <br><br>                         Plaintiff, <br><br>       v. <br><br> UNITED STATES, <br><br>                     Defendant, <br><br>    and <br><br> SEKISUI SPECIALTY CHEMICALS AMERICA, LLC, <br><br>                 Defendant-Intervenor. | **Before: Gregory W. Carman, Judge** <br><br> Court No. 11-00095 |

## OPINION & ORDER

[Commerce's final determination is sustained in part, remanded in part]

Dated: April 10, 2013

*Edmund W. Sim, Kelly A. Slater, and Jay Y. Nee,* Appleton Luff Pte Ltd., of Washington, DC, for Plaintiff.

*Melissa M. Devine and L. Misha Preheim*, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for Defendant. With them on the brief were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director.  Of counsel on the brief was *Jonathan M. Zielinski*, Senior Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce.

*Daniel J. Plaine, Thomas M. Johnson, Jr., Andrea F. Farr, and James F. Doody*, Gibson Dunn & Crutcher, LLP, of Washington, DC, for Defendant-Intervenor.

CARMAN, JUDGE: Plaintiff Chang Chun Petrochemical Company Limited

("Plaintiff" or "CCPC") contests the final determination by the United States

Department of Commerce ("Defendant" or "Commerce") in the investigation of an

antidumping duty order on polyvinyl alcohol ("PVA") from Taiwan.  *See Polyvinyl*

*Alcohol from Taiwan,* 76 Fed. Reg. 5,562 (Dep't of Commerce Feb. 1, 2011) (final

determination of sales at less than fair value) ("*Final Determination*"), P.R.[1] 157, and

accompanying Issues and Decision Memorandum, A-583-841 (Jan. 26, 2011) ("I&D

Memo"), P.R. 153.  Pursuant to its motion for judgment on the agency record

challenging Commerce's *Final Determination*, Plaintiff seeks a remand to the agency for

reconsideration of Commerce's decision to apply the targeted dumping methodology to

CCPC's sales.  Mot. for J. on the Agency R. 56.2, ECF No. 23.

Upon review of the underlying record and motion papers, the Court sustains in

part and remands in part Commerce's *Final Determination*.  Commerce did not provide

an explanation of why the transaction-to-transaction method cannot be used in this

investigation as required by the regulation at issue.  Commerce also did not provide an

explanation of why it declined to limit its application of the targeted dumping

---

[1] "P.R." stands for "Public Record."

methodology in this particular case as required by the regulation at issue.

Procedural History

This case has a long procedural history, whereby the issues in the instant case

arose from the timing of the interrupted investigation.  Therefore, an outline of the

relevant dates and corresponding events will contextualize the current issues.  The

subject product is polyvinyl alcohol ("PVA"), which is a water-soluble synthetic

polymer, from the Republic of China ("Taiwan").

In 1997, Commerce promulgated a targeted dumping regulation which

supplemented the targeted dumping statute.  *See* 19 C.F.R. § 351.414(f) (2004)[2]

(hereinafter referred to as the "2004 Regulation").[3]

---

[2] All references to Title 19 of the Code of Federal Regulations refer to the 2004 edition, unless otherwise stated.  The provision at issue in the instant case, 19 C.F.R. § 351.414(f), did not change between its promulgation in 1997 and the initiation of this investigation in 2004.

[3] The targeted dumping provision, codified at 19 C.F.R. § 351.414(f) in 1997 and revoked in 2008, stated:

> (f) *Targeted dumping*—(1) *In general*. Notwithstanding paragraph (c)(1) of this section, the Secretary may apply the average-to-transaction method, as described in paragraph (e) of this section, in an antidumping investigation if:
>> (i) As determined through the use of, among other things, standard and appropriate statistical techniques, there is targeted dumping in the form of a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time; and
>> (ii) The Secretary determines that such differences cannot be taken

In September of 2004, Celanese Chemicals America, LLC ("Celanese")—now

known as Sekisui Speciality Chemicals America LLC ("Sekisui"), defendant-intervenor

in this case, and a domestic producer of PVA—filed a petition against PVA from Taiwan

that is the underlying administrative proceeding at issue.  Celanese alleged all three

types of targeted dumping[4]—for customer, region and time period—concerning CCPC,

plaintiff in this case and the only known producer of PVA in Taiwan during the period

of investigation from July 2003 to June 2004.  On October 4, 2004, Commerce initiated a

less than fair value investigation on PVA from Taiwan.  *Polyvinyl Alcohol from Taiwan*, 69

Fed. Reg. 59,204 (Dep't of Commerce Oct. 4, 2004) (initiation of antidumping duty

investigation), P.R. 28.

---

into account using the average-to-average method or the transaction-to-transaction method and explains the basis for that determination.

  (2) *Limitation of average-to-transaction method to targeted dumping*. Where the criteria for identifying targeted dumping under paragraph (f)(1) of this section are satisfied, the Secretary normally will limit the application of the average-to-transaction method to those sales that constitute targeted dumping under paragraph (f)(1)(i) of this section.

  [4] Targeted dumping "occurs when a seller is providing lower prices to only certain United States purchasers, in certain regions, or during certain periods of time, to manipulate the dumping margin calculated during an investigation."  Def.'s Mem. in Opp'n to Pl.'s Rule 56.2 Mot. for J. Upon the Agency R. ("Def.'s Opp'n") at 10, ECF No. 32.

On October 22, 2004, the International Trade Commission ("ITC" or

"Commission") preliminarily determined that the domestic PVA industry was not

materially injured or threatened with material injury.  *Polyvinyl Alcohol from Taiwan*, 69

Fed. Reg. 63,177 (Int'l Trade Comm'n Oct. 29, 2004) (preliminary determination).

Consequently, Commerce terminated its investigation.  Petitioner timely appealed the

Commission's negative injury determination to this court.[5]

In January of 2007, the court issued a decision in *PVC Case I* and remanded it to

the Commission for reconsideration.  *See Celanese Chems. Ltd. v. United States*, 31 C.I.T.

279 (2007) ("*PVC Decision I*").[6]  Three months later, the Commission reversed its

negative injury determination on remand.  In November of 2008, the court sustained the

Commission's remand results. *Celanese Chems. Ltd. v. United States*, 32 C.I.T. 1250 (2008)

("*PVC Decision II*").[7]  Defendant and defendant-intervenors timely appealed the court's

affirmation of the Commission's remand results, but the appeals court upheld *PVC*

*Decision II* without opinion.  *Celanese Chems. Ltd. v. United States*, 358 Fed. Appx 174

(Fed. Cir. 2009).

---

[5] The appeal of the Commission's negative injury determination was a related case, with which familiarity is presumed, notwithstanding that it was decided by a different judge.  *See* Court No. 04-00594.  For ease of reference, this first case litigating injury will be referred to as *PVC Case I*.

[6] *PVC Decision I* is the first opinion in *PVC Case I*.

[7] *PVC Decision II* is the second opinion in *PVC Case I*.

In March of 2010, the Commission notified Commerce of the affirmative preliminary injury determination, and accordingly, Commerce resumed its investigation.  *See* Letter from Commission to Commerce, Re: Polyvinyl from Taiwan: Investigation No. 731-TA-1088 (Preliminary) (Remand), dated Mar. 25, 2010, P.R. 54.  In September of 2010, Commerce issued its preliminary determination of dumping, *Polyvinyl Alcohol from Taiwan*, 75 Fed. Reg. 55,552 (Dep't of Commerce Sept. 13, 2010) (preliminary determination of sales at less than fair value and postponement of final determination) ("*Preliminary Determination*"), P.R. 127, and five months later its final determination of dumping, *Final Determination*, 76 Fed. Reg. at 5,562.  The antidumping order was published in mid-March.  *Polyvinyl Alcohol from Taiwan*, 76 Fed. Reg. 13,982 (Dep't of Commerce Mar. 15, 2011) (antidumping order)("*AD Order*"), P.R. 162.

In December of 2008, during the time that the injury determination was being litigated and the administrative investigation was on hold, Commerce issued an interim final rule[8] which removed the targeted dumping regulation—19 C.F.R. § 351.414(f)— that had been in effect at the time the PVA investigation was initiated in 2004.

At the heart of this case is whether Commerce properly applied the proper regulation.  Plaintiff brings this action seeking review of Commerce's lack of

---

[8] *Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations*, 73 Fed. Reg. 74,930 (Dep't of Commerce Dec. 10, 2008) (interim final rule) (hereinafter referred to as "Withdrawal Notice").

explanation regarding its application of the targeted dumping regulation.

## STANDARD OF REVIEW

The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2006).[9]  The Court

sustains determinations, findings or conclusions of an agency unless they are

"unsupported by substantial evidence on the record, or otherwise not in accordance

with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Courts "look for a reasoned analysis or

explanation for an agency's decision as a way to determine whether a particular

decision is arbitrary, capricious or an abuse of discretion."  *Wheatland Tube Co. v. United*

*States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).

## DISCUSSION

Plaintiff's challenges can be boiled down to two issues.  The first issue is whether

Commerce applied the proper regulation to the instant investigation.  Specifically,

which regulation was applied—the regulation in effect at the time the investigation was

initiated (the "2004 Regulation") or the regulation in effect at the time the investigation

was concluded (the "2011 Regulation")?  The second issue is whether Commerce

properly applied the regulation to the instant investigation.  Specifically, was

Commerce's determination to apply the average to transaction methodology to all of

---

[9] All references to the United States Code refer to the 2006 edition, unless otherwise stated.

CCPC's sales rather than just to the targeted sales supported by substantial evidence on

the record or otherwise in accordance with law?

## I.        Statutory & Regulatory Framework

### A.        Statutory Framework

The dumping statute authorizes three methods[10] to determine "whether the

subject merchandise is being sold in the United States at less than fair value" in an

investigation: average-to-average, transaction-to-transaction, and average-to-

transaction.  *See* 19 U.S.C. § 1677f-1(d)(1).[11]  The statutory framework instructs that

---

[10] The Court refers to Commerce's regulatory shorthand for the three statutory methods—average-to-average, transaction-to-transaction, average-to-transaction—in order to render this opinion less cumbersome.  The regulatory description of the three methods is as follows:

> (b) *Description of methods of comparison*—(1) *Average-to-average method*. The "average-to-average" method involves a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise.
>
>   (2) *Transaction-to-transaction method*. The "transaction-to-transaction" method involves a comparison of the normal values of individual transactions with the export prices (or constructed export prices) of individual transactions for comparable merchandise.
>
>   (3) *Average-to-transaction method*. The "average-to-transaction" method involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise.

19 C.F.R. § 351.414(b).

[11] The relevant statute, 19 U.S.C. § 1677f-1(d), in its entirety provides:

Commerce "shall" generally use one of the two methods described in subsection (A):

either the average-to-average or the transaction-to-transaction.  However, the statute

provides an "exception" where Commerce "may" use the average-to-transaction

---

**(d) Determination of less than fair value**
    **(1) Investigations**
        **(A) In general**
        In an investigation under part II of this subtitle, the administering authority shall determine whether the subject merchandise is being sold in the United States at less than fair value -
            **(i)** by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise, or
            **(ii)** by comparing the normal values of individual transactions to the export prices (or constructed export prices) of individual transactions for comparable merchandise.
        **(B) Exception**
        The administering authority may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise, if -
            **(i)** there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
            **(ii)** the administering authority explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

method described in subsection (B) if two prerequisites are met: (1) there is a finding of

targeted dumping; and (2) Commerce explains why such differences cannot be taken

into account using either the average-to-average or transaction-to-transaction method.

19 U.S.C. § 1677f-1(d)(1)(B).

The first statutory requirement is for Commerce to find targeted dumping in at

least one of three ways: to a customer, in a region or during a period of time.  *See id.*

The second statutory requirement is for Commerce to provide an explanation why the

two general methodologies—average-to-average or transaction-to-transaction—are

insufficient.  While the statute prefers the two general methodologies over the exception

methodology, it is silent as to when to apply the general two methodologies.  *See id.*

Further, the statute is also silent as to the body of sales to which Commerce will apply

the exception methodology.  When a statute is silent, Commerce is "entitled to

formulate policy and make rules 'to fill any gap left, implicitly or explicitly, by

Congress.'"  *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (*quoting

Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (internal

quotations omitted)).

### B.    Regulatory Framework

In May of 1997, exercising its gap-filling authority, Commerce promulgated a

targeted dumping regulation.  First, to fill the statutory gap, Commerce listed

preferences between the general comparison methodologies in investigations, using the

average-to-average "normally" and using the transaction-to-transaction "only in

unusual situations."  *See* 19 C.F.R. 351.414(c)(1).[12]  Regarding targeted dumping,

Commerce essentially mimicked the statute in subsection (f)(1) by requiring a finding of

targeted dumping and explaining why the general methods are insufficient, if

Commerce chooses to use the exception method.  *See* 19 C.F.R. § 351.414(f)(1), *supra* n.3.

However, Commerce filled the statutory gap with subsection (f)(2) by limiting the

application of the exception method to only the targeted sales.  *See id.*  Citing its "lack of

experience" with the targeted dumping statute, Commerce refused to create any bright

line rules in its application of the average-to-transaction method, explaining that its

practice would evolve as it gained experience with targeted dumping.  *Antidumping*

*Duties; Countervailing Duties: Notice for proposed rulemaking and request for Public*

*Comments*, 61 Fed. Reg. 7,308, 7,350 (Dep't of Commerce Feb. 27, 1996) ("*Proposed*

*Rules*"); *see also Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,374-75

---

[12] The preference provision provides:

   (c) *Preferences*. (1) In an investigation, the Secretary normally will use the average-to-average method. The Secretary will use the transaction-to-transaction method only in unusual situations, such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made.

19 C.F.R. § 351.414(c)(1).

(Dep't of Commerce May 19, 1997) ("*Final Rule*").[13]  Commerce notably rejected one

commentator's suggestion to apply the average-to-transaction to all of a firm's sales if

targeted dumping is found, stating that "in many instances such an approach would be

unreasonable and unduly punitive."  *Proposed Rules*, 61 Fed. Reg. at 7,350.  Commerce

identified, however, two examples of when it would be appropriate to apply the

average-to-transaction method to all of a firm's sales: "where the targeted dumping

practice is so widespread it may be administratively impractical to segregate targeted

dumping pricing from the normal pricing behavior of a company" or "where a firm

engages extensively in the practice of targeted dumping."  *Final Rule*, 62 Fed. Reg. at

27,375; *see also* Def.'s Opp'n at 15 ("In the past, when applying [the 2004 Regulation],

Commerce would use the average-to-transaction comparison methodology to all sales

only when it was impracticable to segregate the targeted sales or when the targeting

was extensive.").[14]

---

[13] "In the preamble to the proposed regulations, [Commerce] specifically avoided the adoption of any *per se* rules on targeted dumping due to [its] limited experience administering this provision of the Act.  However, [Commerce] recognizes the need to establish guidance in this area and thus will issue policy bulletins setting forth more specific criteria as [it] develops its practice in this area."  *Final Rule*, 62 Fed. Reg. at 27,374.

[14] On December 10, 2008, Commerce repealed its targeted dumping regulation. *See* Withdrawal Notice, 73 Fed. Reg. 74,930.  Commerce decided to remove the targeted dumping provision from the regulation, "returning to a case-by-case adjudication" in which Commerce would be able to "exercise the discretion intended by the statute."  *Id.* at 74,931; *see* Less-Than-Fair-Value Investigation on Polyvinyl Alcohol from Taiwan:

**II.     Contentions of the Parties**

**A.     Plaintiff's Contentions**

Plaintiff CCPC contends that Commerce did not properly apply the 2004

Regulation to this investigation but rather impermissibly retroactively applied the 2011

Regulation, ignoring "temporal limitations" to apply new policies to CCPC.  *See* Mem.

of Points and Authorities in Supp. of Pl. Chang Chun Petrochemical Co. Ltd.'s C.I.T.

Rule 56.2 Mot. for J. Upon the Agency R. ("Pl.'s Mot.") at 8-9, ECF No. 24.  CCPC avers

that Commerce improperly applied a later-developed standard to this investigation

when it applied the average-to-transaction methodology to all of the sales, instead of

only to the targeted sales.  *Se*e Pl.'s Mot. at 20.  While conceding that "the term

'normally' does confer some discretion," CCPC asserts that "[t]he term 'normally'

imposes a limitation on the discretion of Commerce, a limitation that Commerce itself

recognized when it went to the trouble of issuing the [Withdrawal Notice] to remove

---

Targeted Dumping - Chang Chun Petrochemical Co., Ltd., A-583-841 (Sept. 7, 2010)
("Targeted Dumping Memo") at 7, P.R. 125.  Then in March of 2010, Commerce
articulated a new policy regarding targeted dumping: it would apply the average-to-
transaction method to all sales, regardless of whether the sales were targeted or not,
whenever a firm was found to have engaged in targeted dumping.  *See* Def.'s Opp'n at
14.  Commerce "explained that, when it has chosen a comparison methodology under
19 U.S.C. § 1677f-1(d)(1)(A), it applies that methodology uniformly. . . . [T]o be
consistent, Commerce [applies] the average-to-transaction methodology uniformly to
sales." *Id*.  While all parties agree that the 2004 Regulation applies to the instant
investigation, the Withdrawal Notice is important because it provides insight into
Commerce's actions and the arguments in this case.

the regulations and the [word] 'normally' . . . contained therein." Reply Br. in Supp. of

Pl. Chang Chun Petrochemical Co. Ltd.'s Mot. for J. Upon the Agency R. ("Pl.'s Reply")

at 7, ECF No.36.

Plaintiff proffers that "[a] review of all Commerce proceedings between early

1996 and late 2008 in which targeted dumping was found reveals that Commerce's

normal practice was to limit the application of the average-to-transaction methodology

<u>only</u> to those sales that constitute targeted dumping," and accordingly went against its

own precedent in this case. *Id*. at 22 (emphasis in original). Thus, Plaintiff postulates

that Commerce bootstrapped its post-Withdrawal Notice policy in the instant

investigation "to negate the limitation contained" in the 2004 Regulation. *Id*. at 20.

Finally, CCPC contends that Commerce "provided no explanation of why the level of

targeted dumping in CCPC's case warranted this treatment [to all sales]," Pl.'s Reply at

12, and therefore Commerce did not provide a rational basis for deviating from the

normal application of 19 C.F.R. § 351.414(f)(2), Pl.'s Mot. at 24-5.

### B.    Defendant's Contentions

Defendant Commerce contends that it properly applied the 2004 Regulation to

this investigation. *See* Def.'s Opp'n at 14-5. Commerce argues that it interprets its own

regulation to provide itself with discretion to apply the average-to-transaction method

to all sales and not only to targeted sales, "when appropriate." *Id*. at 5, 15-6.

Commerce explains that "the word 'normally' contained in [19 C.F.R. § 351.414(f)(2)]

allows [Commerce] substantial discretion in the application of the regulation on a

context-specific basis" and that the targeted dumping provision of the 2004 Regulation

does "not limit the circumstances in which [Commerce] may deviate from applying the

average-to-transaction comparison methodology to only the targeted sales.  Thus,

[Commerce] has the discretion to determine when it is appropriate to deviate from this

limitation in any particular case."  *Id*. at 18.

 Further, Commerce elucidates that the Withdrawal Notice "did not promulgate

any new regulations to replace subsection (f), and did not adopt any new

methodologies to be applied in targeted dumping situations."  *Id*. at 21.  Defendant

avers that it did apply the 2004 Regulation when determining which sales should be

compared using the average-to-transaction comparison methodology, *id*. at 19, and

"provided more than adequate explanation for its decision to apply average-to-

transaction comparisons" to all of CCPC's U.S. sales, *id*. at 25.  Commerce advances

that "this was not a retroactive application of a new rule, but rather, the

contemporaneous application of a current practice that is consistent with the applicable

regulation."  *Id*. at 24; *see also*, I&D Memo at 7.  Accordingly, "Commerce reasonably

determined that it was appropriate to follow its current practice, which is based upon

statutory interpretation and policy goals."  Def.'s Opp'n at 24.

### C.      Defendant-Intervenor's Contentions

Defendant-Intervenor Sekisui Specialty Chemicals America, LLC sets forth

essentially the same contentions as the Defendant.  Sekisui reiterates that Commerce

acted within its sound discretion, as provided by the 2004 Regulation, in applying the

average-to-transaction  methodology to all of CCPC's U.S. sales, and "did not apply

the regulatory guidance set forth in the Withdrawal Notice, retrospectively or

otherwise."  Resp. Br. of Sekisui Specialty Chemicals America, LLC in Opp'n to Chang

Chun Petrochemical Co. Ltd.'s Mot. for J. Upon the Agency R. ("Def.-Int.'s Opp'n") at

16, ECF No. 30**.**

### III.     Application of the Regulations

The regulation in effect at the time this investigation was initiated included the

targeted dumping provision, 19 C.F.R. § 351.414(f).  During the time that the ITC's

injury determination—*PVC Case I*—was being litigated and Commerce's investigation

was interrupted, Commerce issued a final interim rule which removed the targeted

dumping provision.  *See* Withdrawal Notice, 73 Fed. Reg. at 74,930.  It is undisputed

that the 2004 Regulation, which was in effect when this investigation was initiated in

2004, comprises part of the law governing Commerce's determination.  At issue is

whether Commerce properly applied the 2004 Regulation to this investigation.

When analyzing proper application of the statutory and regulatory framework

to an investigation, the Court operates within its statutorily mandated standard of

review.  The Court is obligated to sustain determinations, findings or conclusions of

Commerce unless they are "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  The court "look[s]

for a reasoned analysis or explanation for an agency's decision as a way to determine

whether a particular decision is arbitrary, capricious or an abuse of discretion."

*Wheatland Tube*, 161 F.3d at 1369.  Under the substantial evidence standard, "[f]ailure of

the decision-maker to provide the court with the basis of its determination" is

impermissible.  *A. Hirsch, Inc. v. United States*, 729 F. Supp. 1360, 1362, 14 C.I.T. 23, 25

(1990) (internal quotations omitted).  Although an agency "is allowed wide latitude in

its decision-making, . . . it is not exempt from articulating its reasoning."  *Id*.

### A.     Did Commerce Apply the Proper Regulation

The first issue for the Court to address is whether Commerce applied the proper

regulation to this investigation.  Specifically, was the 2004 Regulation or the 2011

Regulation applied?  Plaintiff contends  that the 2011 Regulation was impermissibly

retroactively applied to the investigation rather than the 2004 Regulation.  Pl.'s Mot. at

8-9.  The investigation was originally initiated in 2004, while the 2004 Regulation was

still in effect, then placed on hold during the litigation of a separate issue, and finally

resumed and decided in 2010, when the 2011 Regulation had become effective.  All

parties agree that the 2004 Regulation should have been applied to this investigation,

but Plaintiff complains that Commerce instead improperly applied the 2011 Regulation

and that corresponding policy.  *See* Pl.'s Reply at 2, 4; Def.'s Opp'n at 6, Def.-Int.'s

Opp'n at 18.

There is ample evidence on the record that Commerce was aware that the

regulation had changed during the course of the investigation and applied to this

investigation the regulation in effect at the time the investigation was initiated—the

2004 Regulation—rather than the regulation that was in effect at the time the

investigation was concluded—the 2011 Regulation.  *See* Def.'s Opp'n at 14-15, Targeted

Dumping Memo at 7-8, I&D Memo at 1-7.  The petition alleged all three types of

targeted dumping—customer, region, and time period—which triggered the targeted

dumping provision in the 2004 Regulation.  *See* Targeted Dumping Memo at 4.  Upon

review of the record, the Court finds that Commerce applied the proper

regulation—the 2004 Regulation—to the instant investigation.

### B.    Did Commerce Properly Apply the Regulation

The more involved issue for the Court to address is whether Commerce *properly*

applied the 2004 Regulation.  Specifically, was Commerce's determination to apply the

average-to-transaction methodology to all of CCPC's sales, rather than to just the

targeted sales, supported by substantial evidence on the record or otherwise in

accordance with law?  As discussed above, because the petition alleged three types of

targeted dumping, 19 C.F.R. § 351.414(f) was triggered and Commerce applied the

targeted dumping test.  *See* Targeted Dumping Memo at 4-7.  The targeted dumping

regulation is applied in sequential order, starting with subsection (f)(1).

### 1.      19 C.F.R. § 351.414(f)(1)

Commerce satisfied the first requirement of this subsection, 19 C.F.R.

§ 351.414(f)(1)(i), when it found two types of targeted dumping, by customer (to one

customer) and by time period (during a time period of two months).  *See id*.; *see also*

Def.'s Opp'n at 5, *Preliminary Determination*, 75 Fed. Reg. at 55,554.  Commerce partially

satisfied the second requirement of this subsection, 19 C.F.R. § 351.414(f)(1)(ii), by

explaining that "differences in the patterns of [export prices] cannot be taken into

account using the average-to-average methodology" because it "conceals differences in

the patterns of prices between targeted and non-targeted groups by averaging low-

priced sales to the targeted group with high-priced sales to the non-targeted group."

Targeted Dumping Memo at 7.  However, the second provision under subsection

(f)(1)(ii) requires not only an explanation of why the average-to-average methodology

is insufficient but also an explanation of why the transaction-to-transaction

methodology is also insufficient.  *See*  19 C.F.R. § 351.414(f)(1)(ii) (requiring that

Commerce "determines that such differences cannot be taken into account using the

average-to-average method *or the transaction-to-transaction method* and explains the

basis for that determination") (emphasis added).[15]  Upon review of the record,

Commerce provides no explanation why the transaction-to-transaction method cannot

be used in this case.

The Court recognizes that in an investigation, the regulations list a preference

for the average-to-average method and that the transaction-to-transaction method will

be used "only in unusual situations, such as when there are very few sales of subject

merchandise and the merchandise sold in each market is identical or very similar or is

custom-made."  19 C.F.R. § 351.414(c)(1).  The Court notes that it is not its role to

decide if the transaction-to-transaction method could have been applied in this case.

Commerce has the expertise to analyze the facts and make such a decision, and as long

as its decision is supported by substantial evidence on the record and is otherwise in

accordance with law, this Court will uphold that decision.  However, the Court has

combed the record and cannot find the requisite reasoning or explanation as to why

the transaction-to-transaction method is insufficient for this investigation.  Thus, the

Court finds that Commerce's *Final Determination* is not in accordance with law because

---

[15] This is not only a regulatory requirement but also a statutory requirement:
before using the average-to-transaction method, Commerce must explain why the
average-to-average or the transaction-to-transaction methods cannot be used.  19 U.S.C.
§ 1677f-1(d)(1)(B).

it lacks an explanation regarding the insufficiency of using the transaction-to-

transaction method in this investigation.  Accordingly, the Court remands this issue to

Commerce.

### 2.        19 C.F.R. § 351.414(f)(2)

Only after 19 C.F.R. § 351.414(f)(1) is satisfied can Commerce get to 19 C.F.R.

§ 351.414(f)(2).  Even then, subsection (f)(2) contains a caveat: it "normally" limits the

application of the average-to-transaction method to only the targeted sales in the U.S.

19 C.F.R. § 351.414(f)(2).  Citing the regulatory limitation language of subsection (f)(2),

Plaintiff argued that application of the average-to-transaction methodology should be

"strictly limited" to the dumped sales rather than applied to all sales.  Pl.'s Mot. at 24.

Commerce, however, counter-argued that it "has the discretion to depart from that

limitation when appropriate."  Def.'s Opp'n at 16.  Commerce justified its decision to

apply the average-to-transaction methodology to all CCPC's sales by stating that the

targeted dumping regulation gave it "the discretion to depart from limiting the

application of the average-to-transaction methodology to those sales that constitute

targeted dumping" and by explaining that "because we have developed a practice

which better reflects Congressional intent, it is appropriate to apply the average-to-

transaction methodology to all U.S. sales that CCPC reported."  Targeted Dumping

Memo at 8.  Commerce applied its post-Withdrawal Notice policy, explaining that

"[o]nce we determine that the customer, regional or time-period pattern-of-price

differences are significant, our recent practice has been to apply the average-to-

transaction methodology to all sales regardless of whether they are targeted."  *Id*. at 7.

The crux of this issue, then, turns on two considerations: the permissible range of

discretion Commerce may exercise due to the presence of the word "normally" in 19

C.F.R. § 351.414(f)(2), and the timing of Commerce's change in policy regarding the

application of the average-to-transaction method.

### i.      *Normally Requires Reasoning*

The Court will first consider Plaintiff's argument regarding the permissible

discretion afforded by the word "normally" in the targeted dumping regulation.  A

regulation differs from a policy because it is binding on an agency.  Commerce is

granted "due deference for its reasonable interpretation of its own regulations."

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1270, 30 C.I.T. 1671, 1678 (2006).

However, Commerce's "wide latitude in its decision-making" does not exempt

Commerce from "articulating its reasoning."  *A. Hirsch*, 729 F. Supp. at 1362.  "Failure

of the decision-maker to provide the court with the basis of its determination precludes

the court from fulfilling its statutory obligation on review," and such a failure is

contrary to law.  *Id*. at 1362, 1365.

With these principles in mind, the Court gives deference to Commerce's

decision while also requiring Commerce to comply with its own regulatory language

limiting application of the average-to-transaction method to all sales only in non-

normal situations.  In order to determine whether Commerce's decision was supported

by substantial evidence, the Court looks on the record for a reasoned analysis or

explanation for Commerce's decision as to why this case was not normal and thus

justified universal application of the average-to-transaction method to all of Plaintiff's

sales.  The record, however, appears to be void of this requisite reasoned analysis or

explanation.

> In the case at hand, Commerce proclaimed that:

> The use of the qualifier "normally" in 19 C.F.R. § 351.414(f)(2) (2004)
> indicates that we have the discretion to depart from limiting the
> application of the average-to-transaction methodology to those sales
> that constitute targeted dumping if we find it appropriate.   We
> preliminarily determine that such a departure is appropriate in this
> investigation.  After this investigation was initiated, we withdrew this
> regulation because we recognized that the regulation may have
> established thresholds or other criteria that have prevented the use of
> this comparison methodology to unmask dumping, contrary to
> Congressional intent. . . . Since the publication of the *Withdrawal
> Notice,* . . . we have refined our practice in cases involving targeted
> dumping to better reflect Congressional intent.  Specifically, if the
> criteria of [the targeted dumping statute] are satisfied, [Commerce]
> will apply average-to-transaction comparisons for all sales in
> calculating the weighted average dumping margin.

Targeted Dumping Memo at 6-7 (internal citations omitted).  Immediately following its

declaration that departure from the norm is warranted in this investigation, Commerce

explains its new policy of universal application of the average-to-transaction method to

all sales.  This is not an explanation of why this case in particular is not normal and

therefore requires Commerce to disregard the limitation.  Commerce's rationale on the

record is flawed because it does not provide an explanation from within the context of

the old regulation that should be applied to this proceeding.  This cannot and does not

satisfy the 2004 Regulation.

Commerce made a determination that was crucial to Plaintiff's dumping

margin, which requires Commerce to support its determination with substantial

evidence on the record and to articulate its reasoning so the Court can meaningfully

review Plaintiff's challenge.  Because Commerce has not provided a reasoned analysis

or explanation for its decision that this situation requires a departure from the norm,

the Court cannot review whether Commerce's decision was reasonable.  Accordingly,

the Court holds that Commerce's lack of reasoned analysis or explanation regarding

why this investigation does not constitute a normal situation means that its

determination is not in accordance with law.  The Court therefore remands this case to

Commerce to properly apply the 2004 Regulation, including the limitation on targeted

dumping methodology, and to fully explain the manner in which it applies the

regulation based on the record and the law applicable at the time the investigation was

initiated.

### ii.     Policy Is Not Binding

The Court will next address Plaintiff's policy argument.  During the

promulgation of the targeted dumping regulation, as discussed above, Commerce

offered two examples of what it did not consider "normal" situations, and when the

average-to-transaction method would thus be applied to all sales: when "targeted

dumping by a firm is so pervasive that the average-to-transaction method becomes the

best benchmark for gauging the fairness of that firm's pricing practices," *Antidumping*

*Duties; Countervailing Duties*, 61 Fed. Reg. at 7,350, and when "the targeted dumping

practice is so widespread it may be administratively impractical to segregate targeted

dumping pricing from the normal pricing behavior of a company," *Antidumping Duties;*

*Countervailing Duties*, 62 Fed. Reg. at 27,375.  These two examples formed Commerce's

average-to-transaction application policy under the 2004 Regulation, which was the

policy in place at the time the investigation was initiated.  Commerce explains that

"[i]n the past, when applying [19 C.F.R. § 351.414(f)(2)], Commerce would use the

average-to-transaction comparison methodology to all sales *only when* it was

impracticable to segregate the targeted sales or when the targeting was extensive."

Def.'s Opp'n at 15 (emphasis added).

In March of 2010, Commerce articulated its new policy shift, from its old policy

of limiting the application of the average-to-transaction methodology to only targeted

sales to its new policy of expanding the application of the average-to-transaction

methodology to all U.S. sales whenever it found targeted dumping.  Commerce

claimed that it will "now apply the average-to-transaction methodology to *all* sales

regardless of whether the sales are targeted . . .. [because] application of the average-to-

transaction method to all sales . . .  is a reasonable [interpretation of the statute] and is

more consistent with [Commerce's] approach to selection of the appropriate

comparison method under [19 U.S.C. § 1677f-1(d)(1)(B)] more generally."  Def.'s Opp'n

at 3-4 (emphasis in original).  Commerce did not establish an effective date for this new

policy.  *See id.* at 4.  This is the policy that was in place at the time the *Final*

*Determination* was published in 2011.

 Plaintiff asserts that Commerce  improperly applied this later-developed new

policy, formed in 2010, to the instant investigation, rather than properly applying the

old policy.  *See* Pl.'s Mot. at 20-25.  By its own admission, it appears that Commerce

applied its new policy to the instant investigation. *See* Targeted Dumping Memo at 7-8.

However, unlike a statute or regulations promulgated through notice and comment

procedures, an agency's policy is not binding on itself.  An agency's policy is merely an

announcement of how an agency will exercise its discretion and can be changed at any

time.  The body of law that comes from *Chevron* and its progeny allows an agency to

change its policy.  Under *Chevron*, Commerce is "allowed to assess the wisdom of its

policy on a continuing basis." *SKF USA Inc.*, 254 F.3d at 1030 (internal citations and

quotations omitted).  It is well-established that "the *Chevron* doctrine contemplates that

agencies can and will abandon existing policies and substitute new approaches." *Tung*

*Mung Dev. Co., Ltd. v. United States*, 354 F.3d 1371,1379 (Fed. Cir. 2004).  The Court of

Appeals for the Federal Circuit has repeatedly applied this principle, stating in a recent

case:

> [t]he fact that Commerce changed its policy is irrelevant, as
> Commerce is entitled to change its views, and a new administrative
> policy based on a reasonable statutory interpretation is nonetheless
> entitled to *Chevron* deference.

*Saha Thai Steel Pipe (Public) Co., Ltd. v. United States*, 635 F. 3d 1335, 1342 (Fed. Cir. 2011)

(*citing Rust. v. Sullivan*, 500 U.S. 173, 186-87 (1991)); *see also U.S. Steel Corp. v. United*

*States,* 621 F.3d 1351 (Fed. Cir. 2010) (upholding Commerce's methodological change

with respect to investigations because it supplied a reasonable explanation for its new

interpretation).  Regardless of Commerce's flexibility to adopt a new policy, it was

required to make a decision in this case pursuant to the regulation that was in place at

the time the case originated.  Although Plaintiff challenges Commerce's shift in policy,

case law does not support relief on that ground.

CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that this case is remanded to Commerce to provide an explanation, pursuant to 19 C.F.R. § 351.414(f)(1)(ii), as to why the transaction-to-transaction method cannot account for the differences in Plaintiff's U.S. sales prices; and it is further

ORDERED that this case is remanded to Commerce to provide a reasoned analysis or explanation, pursuant to 19 C.F.R. 19 C.F.R. § 351.414(f)(2), as to why the specific circumstances of this case are such that the normal limitation on application of the average-to-transaction method is inappropriate to employ here; and it is further

ORDERED that the stay entered by the Court on Plaintiff's motion for oral argument (ECF No. 40) is hereby lifted; and it is further

ORDERED that Plaintiff's motion for oral argument (ECF No. 37) is hereby denied; and it is further

ORDERED that the results of the redetermination on remand shall be filed no later than **Thursday, May 30, 2013**; and it is further

ORDERED that Plaintiff may file comments on such remand results, not to exceed 20 pages, and that such comments shall be filed no later than **Thursday, June 27, 2013**; and it is further

ORDERED that Defendant and Defendant-Intervenor may file replies to

Plaintiff's comments, not to exceed 15 pages, and that such replies shall be filed no later

than **Thursday, July 25, 2013.**


   /s/ Gregory W. Carman   
Gregory W. Carman, Judge

Dated: April 10, 2013
      New York, New York